NMA:ALC
F. # 2014R0055

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                                     Docket No.  14–CR-26 (ARR)

VINCENT ASARO,
JEROME ASARO,
JACK BONVENTRE,
THOMAS DI FIORE,
      also known as "Tommy D," and
JOHN RAGANO,
      also known as "Bazoo,"

             Defendants.

– – – – – – – – – – – – – – – – – –X

## MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL DETENTION

LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nicole M. Argentieri
Alicyn L. Cooley
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of the pretrial detention of the defendants in the above-captioned matter. This morning, a three-count indictment was unsealed charging defendants Vincent Asaro ("V. Asaro"), Jerome Asaro ("J. Asaro") and Jack Bonventre ("Bonventre") with racketeering conspiracy spanning a period of 45 years, including multiple predicate acts that constitute crimes of violence under 18 U.S.C. § 3156 (a).[1] The indictment also charges defendants V. Asaro, J. Asaro, Bonventre, Thomas Di Fiore, also known as "Tommy D" ("Di Fiore") and John Ragano, also known as "Bazoo" ("Ragano"), with substantive counts of extortionate collection of credit conspiracy and extortionate collection of credit, both of which are crimes of violence,[2] based

---

[1]     A compelling factor favoring detention is the charged crimes' status as crimes of violence under 18 U.S.C. § 3156 (a). Section 3156(a)(4) defines the term "crime of violence" to include, inter alia: "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[2]     Both extortionate collection of credit and conspiracy to commit the same qualify as crimes of violence pursuant to the Bail Reform Act. See 18 U.S.C. § 891(7) (defining "extortionate means" to be "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person"); id. § 3156(a)(4)(A) (defining "crime of violence" as having as an element "the use, attempted use, or threatened use of physical force against the person or property of another"); United States v. Cicale, 2006 WL 2252516 (E.D.N.Y. Aug. 7, 2006) ("It is the law of this circuit, as conceded by the defense . . . , that the two loansharking counts against Cicale are crimes of violence, and are especially probative of dangerousness where, as here, the Defendant is alleged to have assaulted a victim to collect a debt." (citing United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir.1991) (finding that violence committed "over a small debt is probative of dangerousness")) (unpublished decision); United States v. DiGiacomo, 746 F. Supp. 1176, 1185 (D. Mass. 1990) (designating loansharking as "crime of violence" for Bail Reform Act purposes; see also

on conduct they committed in March through June of 2013.  The charges relate to the

defendants' participation in the affairs of the Bonanno organized crime family of La Cosa

Nostra (the "Bonanno family"), a violent criminal enterprise that engages in a litany of

crimes, including, among others, murder, robbery, extortion, and obstruction of justice.

All of the defendants are members of the Bonanno family, and all but one hold

high-ranking positions within the crime family.  More specifically, defendants V. Asaro and

Di Fiore are current members of the Bonanno family's administration, the body responsible

for running the crime family; defendants J. Asaro and Bonventre hold the ranks of captain

and acting captain, respectively; and defendant Ragano is a soldier within the family.

As set forth below, the evidence against the defendants is overwhelming and

includes, inter alia, numerous consensual recordings, witness testimony, including the

testimony of multiple cooperating witnesses, forensic evidence, documentary evidence and

visual surveillance.  Moreover, in the cases of J. Asaro, Bonventre and Ragano, shortly after

their release from prison and during their terms of federal supervised release, these

defendants resumed their involvement in the affairs of the Bonanno family and committed

certain of the crimes charged in this case.  The charges thus demonstrate the defendants'

disregard for the authority of the Court and their dedication to a life of crime.

---

United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) ("Certainly, it cannot be gainsaid that extortion is a 'crime of violence' as that term is defined by the BRA."); United States v. Santora, 225 Fed. Appx. 21, 22 (2d Cir. 2007) (upholding district court's finding for pretrial detention purposes that defendant "had committed a crime of violence, specifically conspiracy to commit extortion" (citing 18 U.S.C. § 3142(e); Ciccone, 312 F.3d at 541)) (unpublished decision).

The defendants are scheduled to be arraigned before the Court at 2:00 p.m.
The government respectfully submits this memorandum in support of its request for a
permanent order of detention with respect to all five defendants.  For the reasons set forth
below, each defendant represents a danger to the community and a risk of flight and should
be detained pending trial.[3]

## OVERVIEW OF THE INVESTIGATION

The indictment returned in this case is the result of a long-term investigation
by the Federal Bureau of Investigation (the "FBI") of members and associates of the
Bonanno family operating in the Eastern District of New York.  The investigation has
yielded, among other things, consensual recordings of defendants V. Asaro, J. Asaro,
Bonventre, and Ragano, the testimony of eye witnesses, physical evidence including human
remains, DNA and anthropological evidence, photographic evidence spanning several
decades, and documentary evidence including business, telephone, property and domiciliary
records.

The investigation is the latest in a series of investigations of La Cosa Nostra
prosecuted by this Office.  In those investigations, members and associates of La Cosa
Nostra have agreed to cooperate with the government, including high-ranking members of
the Bonanno family, the Gambino organized crime family (the "Gambino family") and the
Colombo organized crime family (the "Colombo family").  These cooperating witnesses

---

[3]     The government makes this motion without prejudice to making additional
arguments in support of the detention of any of the five defendants whose detention the
government seeks in this motion, and without prejudice to seeking a permanent order of
detention against other defendants indicted in this matter.

have provided overwhelming evidence that the Bonanno family continues to be a violent

criminal enterprise that engages in egregious criminal acts, including murder and assault, and

crimes intended to obstruct justice.

<u>THE INDICTMENT</u>

On January 16, 2014, a grand jury in the Eastern District of New York

returned a sealed indictment charging defendants V. Asaro, J. Asaro and Bonventre with

racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), including multiple predicate

acts that constitute crimes of violence under 18 U.S.C. § 3156(a)(4); and charging all five

defendants with extortionate collection of credit conspiracy, in violation of 18 U.S.C. §

894(a)(1), and extortionate collection of credit, in violation of 18 U.S.C. § 894(a)(1), both of

which are also crimes of violence.

Listed in the chart below is a summary of the charged counts:

| Count # / Racketeering Act ("RA") # | Description & Date | Defendant(s) |
|---|---|---|
| 1 | Racketeering Conspiracy (Jan. 1, 1968 and June 30, 2013) | V. Asaro, J. Asaro, Bonventre |
| 2 | Extortionate Collection of Credit Conspiracy – John Doe #5 (Mar. 1, 2013 – June 30, 2013) | V. Asaro, J. Asaro, Bonventre, Di Fiore, Ragano |
| 3 | Extortionate Collection of Credit – John Doe #5 (Mar. 1, 2013 – June 30, 2013) | V. Asaro, J. Asaro, Bonventre, Di Fiore, Ragano |

Listed in the chart below is a summary of the predicate racketeering acts alleged as part of Count One:

| R.A. # | Description & Date | Defendant(s) |
|---|---|---|
| 1 | Extortionate Extension of Credit Conspiracy/Extortionate Extension of Credit/Extortionate Collection of Credit Conspiracy/Extortionate Collection of Credit (Jan. 1, 1968 – Dec. 31, 1990) | V. Asaro |
| 2 | Murder Conspiracy/Murder/ Accessory After the Fact to Murder – Paul Katz (Dec. 1, 1969 – Dec. 7, 1969; Jan. 1984 – Dec. 1986 (Accessory)) | V. Asaro, J. Asaro (Accessory) |
| 3 | Hobbs Act Robbery Conspiracy/Hobbs Act Robbery/Robbery Conspiracy/Robbery – Lufthansa Airlines (Nov. 1, 1978 – Sept. 1, 1979; Dec. 11, 1978 (Robbery)) | V. Asaro |
| 4 | Arson Conspiracy/Arson (Jan. 1980 – Jan. 1981) | V. Asaro, J. Asaro |
| 5 | Murder Solicitation - John Doe #1 (Jan. 1, 1983 – Dec. 31, 1985) | V. Asaro, J. Asaro |
| 6 | Robbery Conspiracy/Attempted Robbery – Armored Car (Jan. 1984 – Dec. 1986) | V. Asaro, J. Asaro |
| 7 | Hobbs Act Robbery Conspiracy/Hobbs Act Robbery/Robbery Conspiracy/Robbery – Federal Express (Feb. 1, 1984 – Feb. 27, 1984) | V. Asaro, J. Asaro (Conspiracy) |
| 8 | Hobbs Act Extortion Conspiracy/Hobbs Act Extortion/Extortion Conspiracy – John Doe #2 (Jan. 1, 1985 – Jan. 1, 1989) | V. Asaro |
| 9 | Illegal Gambling (Apr. 1994 – Dec. 2002) | V. Asaro |

| 10 | Extortion Conspiracy/Extortion – John Doe #3 (Jan. 2006 – Dec. 2006) | V. Asaro |
|----|----|----|
| 11 | Illegal Gambling (Sept. 1, 2007 – Mar. 1, 2008) | V. Asaro, Bonventre |
| 12 | Extortion - John Doe #4 (Oct. 1, 2010 – Nov. 4, 2010) | V. Asaro |
| 13 | Extortionate Collection of Credit Conspiracy/ Extortionate Collection of Credit - John Doe #5 (Mar. 1, 2013 - June 30, 2013) | V. Asaro, J. Asaro, Bonventre |

<u>APPLICABLE LAW</u>

I.    <u>Bail Reform Act</u>

Under the Bail Reform Act, 18 U.S.C. § 3141, <u>et</u> <u>seq.</u>, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  <u>See</u> 18 U.S.C. § 3142(e).  A finding of dangerousness must be supported by clear and convincing evidence.  <u>See</u> <u>United States v. Ferranti</u>, 66 F.3d 540, 542 (2d Cir. 1995); <u>United States v. Chimurenga</u>, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  <u>See</u> <u>United States v. Jackson</u>, 823 F.2d 4, 5 (2d Cir. 1987); <u>Chimurenga</u>, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the evidence of the defendant's guilt.  <u>See</u> 18 U.S.C. § 3142(g).  Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by

7

way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v.

LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer

in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d

1141, 1145 (2d Cir. 1986) (same).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live
> testimony or cross examination.  Most proceed on proffers.  See
> United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).
> This is because bail hearings are "typically informal affairs, not
> substitutes for trial or discovery."  United States v. Acevedo-
> Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted
> approvingly in LaFontaine, 210 F.3d at 131).  Indeed,
> § 3142(f)(2)(B) expressly states that the Federal Rules of
> Evidence do not apply at bail hearings; thus, courts often base
> detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

## II.   Organized Crime Defendants

Courts in this circuit routinely have faced the issue of pretrial detention of

organized crime defendants charged with racketeering-related offenses.  See, e.g., United

States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family members

detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United

States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss

Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d

535, 543 (2d Cir. 2002); United States v. Defede, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998)

(Lucchese organized crime family acting boss detained as danger to the community); United

States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain

detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364, 1375

(S.D.N.Y. 1986) (Genovese family acting boss detained as danger to the community), <u>order</u> <u>vacated</u>, 794 F.2d 64 (2d Cir.), <u>order reinstated</u>, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand for the following propositions:  (1) leaders of a violent criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are often insufficient to protect the community from dangerous organized crime defendants.

A.      Leaders of a Violent Criminal Enterprise Are Dangerous Due to Their <u>Position of Authority in That Enterprise</u>

Pretrial detention is warranted where defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence.  <u>See</u> <u>Ciccone</u>, 312 F.3d at 543; <u>United States v. Colombo</u>, 777 F.2d 96, 99-100 (2d Cir. 1985); <u>United States v. Bellomo</u>, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Courts in this circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

For example, in Defede, Joseph Defede was charged with extortion and extortion conspiracy. The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Luchese family, thus rendering him a danger to public safety: "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence. Defede's continued liberty therefore presents a substantial danger to the public . . . ." Defede, 7 F. Supp. 2d at 395.

Moreover, a court in this District denied bail to the acting boss of the Genovese family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," Cirillo, slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," id. at 11. The Second Circuit affirmed those findings by summary order. See 149 Fed. Appx. at 43 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise.") (citing Ciccone, 312 F.3d at 543).

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization. Ciccone, 312 F.3d at 542-43; see also Ferranti, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98). As one court has pointed out, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any

10

condition or combination of conditions of release." Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise. As the court held in Defede:

> [I]t is well established that persons who hold Defede's status routinely engage in conduct that is a menace to public safety.  The argument thus is based not on the status, but on the inference that a person in Defede's position is quite likely to engage in dangerous conduct -- just as one reasonably could infer that one holding the position of major league baseball pitcher is entirely likely to hurl a small white object in the direction of home plate.

7 F. Supp. 2d at 392 n.4.

Moreover, in enacting the Bail Reform Act, Congress recognized that certain defendants, such as high-ranking members of an organized crime family fall within a "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." Colombo, 777 F.2d at 99 (quoting S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89).

Nor is the above caselaw narrowly limited to organized crime "bosses" or "acting bosses."  In Salerno, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise.  Likewise, in Colombo,

777 F.2d at 99-100, a captain of a crew in the Colombo family was ordered detained because the operation of that organization posed a risk to the public and a danger to the community by its "consistent pattern of orchestrating a series of violent criminal operations." (internal quotation marks omitted).

      B.     Organized Crime Defendants Are Likely to Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities.  Because organized crime defendants are often career criminals who belong to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail.  See Salerno, 631 F. Supp. at 1375 (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

Congress noted that defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely that they will commit even non-violent crimes that are detrimental to the community.  See S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3195 ("[L]anguage referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").  In Salerno, the court approvingly quoted the Second Circuit's decision in Colombo, which had held:

      In light of Congress' direction that "[w]here there is a strong
      probability that a person will commit additional crimes if

> released, the need to protect the community becomes
> sufficiently compelling that detention is, on balance,
> appropriate," . . . we hold that the decision to release Colombo
> based upon conditions which we consider to be wholly
> inadequate was clearly erroneous.

631 F. Supp. at 1371 (quoting Colombo, 777 F.2d at 99 (quoting Senate Report at 3189)

(citation omitted)).

      C.     Elaborate Bail Packages Are Insufficient to Protect the Community
           Against Violent Organized Crime Defendants

      The Second Circuit repeatedly has rejected "elaborate" bail packages for

dangerous defendants.  See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail package

secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993)

(rejecting $3 million bail package secured with real property, home detention, restricted

visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100

(rejecting $500,000 bail package secured by real property).  In addition, the Second Circuit

has viewed home detention and electronic monitoring as insufficient to protect the

community against dangerous individuals.  In United States v. Millan, the Second Circuit

held that:

> Home detention and electronic monitoring at best elaborately
> replicate a detention facility without the confidence of security
> such a facility instills.  If the government does not provide staff
> to monitor compliance extensively, protection of the community
> would be left largely to the word of [the defendants] that [they]
> will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotation marks omitted).  See

also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the

wonders of science and of sophisticated electronic technology") (internal quotation marks

and citations omitted); United States v. Dono, 275 Fed. Appx. 35, 37 (2d Cir. 2008) (clear

error for district court to release Colombo family defendants on bond with conditions including home confinement, electronic monitoring and requirement that they not associate with members of organized crime where, inter alia, district court's "directives to the defendants not to harass the victims [of a charged assault] or have contact with other Colombo family members do not ensure that they will comply" (citing Colombo, 777 F.2d at 99-100)).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-*4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

<u>ARGUMENT</u>

I.      <u>Nature and Circumstances of the Crimes Charged</u>

The government proffers the following facts as evidence of the seriousness of the crimes charged and the threat posed to the community by the defendants.  <u>LaFontaine</u>, 210 F.3d at 130-31 (government entitled to proceed by proffer in detention hearings).  These facts demonstrate that each of the five defendants should be detained pending trial.

A.      <u>Defendant Vincent Asaro</u>

1.      <u>Defendant Vincent Asaro Is a Captain and a Member of the Administration in the Bonanno Family</u>

a.      <u>Cooperating Witness Information</u>

Defendant Vincent Asaro is an inducted member of the Bonanno family, who currently holds the position of captain and also serves as a member of the crime family's administration, which is responsible for running the affairs of the crime family.  According to a cooperating witness ("CW-1"),[4] V. Asaro was inducted into the Bonanno family more than 30 years ago.  CW-1 has advised that V. Asaro first held the position of captain in the 1990s, but a few years later lost the position (while remaining an inducted member).  CW-1 has advised that in late 2012 or early 2013, V. Asaro was reinstated as a captain and became a member of the administration of the Bonanno family – <u>i.e.</u>, a high-ranking member of the family who participated in making decisions and resolving disputes for the family.

---

[4]      CW-1 pled guilty to racketeering conspiracy, including predicate acts of Hobbs Act robbery and illegal gambling, pursuant to a cooperation agreement in the Eastern District of New York.  CW-1's prior crimes include insurance fraud.  CW-1 is cooperating in the hope of obtaining leniency in sentencing and entry into the Witness Security program. CW-1's information has been corroborated by surveillances, as well as the testimony of other cooperating witnesses, consensual recordings, phone records and other materials.

According to another cooperating witness ("CW-2"),[5] V. Asaro initially reported to his uncle, Mickey Zaffarano, who was then a captain in the Bonanno family, and later, V. Asaro began reporting to CW-2.  CW-2 has advised that, in approximately the early 1990s, V. Asaro was elevated to the position of captain and reported to CW-2, who was at that time the boss of the Bonanno family.  After a few years, CW-2 demoted V. Asaro to the position of soldier because he was abusing his leadership position by "robbing" the individuals who reported to him.  According to CW-2, V. Asaro was a loanshark and a habitual gambler.

According to another cooperating witness ("CW-3"),[6] as of the early 2000s, V. Asaro was reporting to his son, defendant Jerome Asaro, who was a captain in the Bonanno family.

---

[5]     CW-2 is a former high-ranking member of the administration of the Bonanno family, who was convicted in the Eastern District of New York of racketeering with predicate acts of murder, among others, and has subsequently pled guilty to murder-in-aid-of racketeering pursuant to a cooperation agreement in the Eastern District of New York.  CW-2's information has been corroborated by, among other things, physical surveillances, consensual recordings and the testimony of other witnesses.  CW-2 cooperated in the hopes of obtaining leniency in sentencing, including avoiding a sentence of death, and protection in the Witness Security program. At re-sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1 and Rule 35 of the Rules of Federal Criminal Procedure, for a downward departure based upon the substantial assistance provided by CW-2 to the government; CW-2 was sentenced to approximately twelve years' imprisonment.

[6]     CW-3 is a former high-ranking member of the Bonanno family who pled guilty in the Eastern District of New York to racketeering conspiracy, including multiple predicate acts of murder, as well as extortion and illegal gambling, pursuant to a cooperation agreement.  CW-3 cooperated with the government in the hopes of obtaining leniency at sentencing and protection in the Witness Security Program.  CW-3's information has been corroborated by other sources of information, including but not limited to consensual recordings, confidential sources, and cooperating witnesses.  At sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1, for a downward departure based upon the substantial assistance provided by CW-3 to the government; CW-3 was sentenced to approximately seven years' imprisonment.

b.     Consensual Recordings

V. Asaro's leadership position in the Bonanno family has been corroborated

by his own consensually recorded statements.  For example, in an August 17, 2012

consensual recording, V. Asaro informed CW-1 that "[w]e got a new boss.  He sent for me.

He wants me to be consigliere,"[7] i.e., the advisor to the family, or the third highest ranking

member in the family.  V. Asaro also stated that the "new boss" was "[s]ome guy from the

Island, 'Tommy,'" a reference to defendant Thomas Di Fiore.  In another consensual

recording made on August 25, 2012, V. Asaro confirmed to CW-1, in substance and in part,

that V. Asaro was recently promoted to "skipper [captain]" and was on "the panel" or the

"commission" running the Bonanno family; and that he was introduced to defendant Jack

Bonventre as a captain.  In a March 8, 2013 consensual recording, in response to a statement

by CW-1 about V. Asaro's position on "the committee" – another term for the panel running

the Bonanno family – V. Asaro stated, in sum and substance, that he was to attend an

upcoming meeting with other captains including Di Fiore, at which they were going to

discuss "taking some guys down," a reference to demoting inducted members of the crime

family.

c.     Surveillance Evidence

Surveillance of Bonanno family meetings and events has corroborated V.

Asaro's position in the family.  For example, a surveillance conducted on December 29,

2012 by the New York City Police Department (the "NYPD") and the United States

Probation Department for the Eastern District of New York ("Probation"), which was

---

[7]     All of the consensual recording transcripts and references contained in this
memorandum are in draft form and are being provided with the understanding they may not
be used at trial or any other proceeding.

recorded on video, established that V. Asaro and Di Fiore both attended a meeting with known Bonanno family members, including other captains in the Bonanno family, at a diner in Staten Island.[8]  In addition, on September 12 and 13, 2013, a federal investigator conducted surveillance of the wake of former Bonanno family captain Joseph Cammarano, Sr., at a funeral home in Brooklyn.  V. Asaro, Bonventre, Ragano and Di Fiore all were observed at the wake, as were several other inducted members of the Bonanno family.

CW-1 has advised, and consensual recordings of V. Asaro confirm, that V. Asaro has continued to use his position in the Bonanno family to make money through extortion and by demanding a share of the loansharking profits of those below him in the family.  This behavior, as well as V. Asaro's high-ranking status in the Bonanno family, demonstrates V. Asaro's dangerousness and the necessity of a permanent order of detention. See, e.g., United States v. Persico,  No. 10–CR–147 (SLT), 2012 WL 1188243, at *4 (E.D.N.Y. Apr. 6, 2012) (in anonymous jury motion context, "find[ing] ample evidence that the defendants are dangerous" based on their "involvement with and leadership of a criminal organization," which indicates "their propensity for violence," including that defendants held or were related to those who held "powerful position[s] within the crime family" (internal quotation marks omitted)); United States v. Khan, 591 F. Supp. 2d 166, 170-71 (E.D.N.Y. 2008) ("[I]nvolvement with and leadership of a criminal organization indicates Defendant's propensity for violence.").

---

[8]      Also in attendance at that meeting were Bonanno family captain Gerald Chilli and Bonanno family soldier Peter Lovaglio, both of whom were on federal supervised release at the time.  As a result of that meeting, both Chilli and Lovaglio were found guilty of violations of the terms of their supervised release and sentenced to imprisonment.  See United States v. Chilli, No. 08-CR-697 (SJ), Docket No. 222 (sentencing defendant to 18 months' incarceration); United States v. Lovaglio, No. 12-CR-780 (DLI), Docket No. 18 (sentencing defendant to 24 months' incarceration).

2.      Vincent Asaro Is Charged with Crimes of Violence that Span 30 Years

The charges in this case finally hold V. Asaro accountable for crimes of

violence spanning more than 40 years, including murder, armed robbery and extortion.[9]  Not

only are these crimes exceedingly serious on their face, but also, the disturbing facts of the

charged murder and arson, and the scale of the armed robberies and robbery conspiracies,

detailed below, argue in favor of V. Asaro's detention.  The government's evidence of the

most heinous of the defendant's crimes is detailed below.

a.      The Murder of Paul Katz

V. Asaro is charged with the ultimate crime of violence – murder, as well as

conspiracy to commit that murder and serving as an accessory after the fact to it.   The

overwhelming evidence upon which these charges are based is summarized below.

i.      Cooperating Witness Information

CW-1 has advised that in the 1960s, Paul Katz was associated with James

"Jimmy the Gent" Burke, an associate of the Lucchese organized crime family (the

"Lucchese family").  In the late 1960s, CW-1 was a Bonanno family associate who was

assigned to V. Asaro, also a Bonanno family associate.   According to CW-1, V. Asaro and

Burke shared a close criminal association with one another and shared an interest in Robert's

Lounge, a bar that served as a meeting place for V. Asaro's and Burke's crews.

---

[9]      This memorandum discusses in detail only the most violent subset of the
racketeering acts with which Vincent Asaro is charged.  As identified in the chart supra at
pages 5 to 6, Vincent Asaro is also charged with racketeering acts of extortionate extension
and collection of credit, and conspiracies to engage in the same, over a 22-year period;
various extortions; an attempted armed robbery and armed robbery conspiracy; and illegal
gambling in 1994 to 2002 and 2007 to 2008.

According to CW-1, Katz had a warehouse in Richmond Hill that Burke, V. Asaro, and other criminals used to store items seized during "scores," or illegal robberies. The warehouse was raided by law enforcement, and on one such raid, V. Asaro and others were arrested.  Subsequent to V. Asaro's arrest, V. Asaro advised CW-1 that he and others, including Burke, believed that Katz was an informant.  Burke was known to have corrupt police officers on his criminal payroll who would provide Burke with information about individuals seeking to cooperate with law enforcement.[10]

As of late 1969, CW-1 had access to certain houses that were being built in the vicinity of 102nd Road between 82nd Street and 84th Street in Queens, New York.  V. Asaro asked CW-1 to make available one of these vacant houses for a meeting.  Shortly thereafter, V. Asaro and Burke brought the body of Paul Katz into the basement of one such house and buried Katz underneath the cement floor.  V. Asaro told CW-1 that he and Burke had killed Katz with a dog chain because they believed he was a "rat" who was cooperating with law enforcement, in violation of the rules of organized crime.  At V. Asaro's direction, CW-1 finished covering up the hole containing Katz's body.

In the 1980s, V. Asaro directed CW-1 and J. Asaro to dig up and move Katz's body.  At that time, Burke was incarcerated at Lewisberg prison and sent word to V. Asaro to move Katz's body.  CW-1 and J. Asaro went to the house and dug up Katz's body.  CW-1 recalled finding, inter alia, a human skull, bones, and some corduroy clothing material. Together they packaged the remains and then re-cemented the area.

---

[10]    An NYPD detective is expected to testify that in the mid-1980s, he re-opened the investigation into Paul Katz's disappearance in 1969.  He began interviewing individuals closely associated with Katz, as well as certain police officers who were suspected to be on the payroll of James Burke.

ii.   <u>Consensual Recording</u>[11]

On June 17, 2013, the FBI began to dig for the remains of Paul Katz at the basement location near Liberty Avenue that CW-1 had identified.  Also on that day, at approximately 10:00 a.m., CW-1 consensually recorded a meeting with V. Asaro, during which the following discussion was intercepted:

| | |
|---|---|
| V. Asaro: | What happened? |
| CW-1: | The feds are all over Liberty Avenue. |
| V. Asaro: | For what? |
| CW-1: | By, you know— |
| V. Asaro: | [A Bonanno family associate]? |
| CW-1: | Yeah. |
| V. Asaro: | For what? |
| CW-1: | I don't know. |
| V. Asaro: | How do you know? |
| CW-1: | I just came from— my doctor is there. |
| V. Asaro: | Who they looking for?  John there? |
| CW-1: | I'm talking about Liberty Avenue where . . . . (silence)[12] |

(V. Asaro puts car in park and sighs).

| | |
|---|---|
| CW-1: | You know what I mean? |

---

[11]   A copy of the consensual recording, which is marked as Exhibit A will be provided to defense counsel subject to the entry and under the terms of a protective order, a proposed version of which will be submitted to the Court under separate cover.

[12]   CW-1 is expected to testify that the vacant house where Katz was buried was located near Liberty Avenue.

| | |
|---|---|
| V. Asaro: | No, I don't know what you mean.  All right, let me go, go ahead, go— |
| CW-1: | Where do you want me to go?  What, what should I do? |
| V. Asaro: | What should you do what? |
| CW-1: | Nothing. |
| V. Asaro: | Nothing, what could you do? |
| CW-1: | All right, well get in touch with me, let me know. |
| V. Asaro: | I'll see you later, [CW-1].  Don't call me! |
| CW-1: | All right, don't call you! |

           iii.     <u>Surveillance Evidence</u>

Minutes after CW-1 left V. Asaro's car at the end of the foregoing conversation and V. Asaro drove away, FBI agents observed V. Asaro enter the passenger side of a different car parked in the vicinity of a Bonanno family associate's towing business on Liberty Avenue.  The car then drove past the site of the FBI's dig on Liberty Avenue, made a U turn and went back down Liberty Avenue in the direction from which it had come. Later that afternoon, FBI agents observed V. Asaro, in the first car again, drive to J. Asaro's business in Inwood, New York, park the car outside the business, and enter the business.  A car registered to J. Asaro was observed parked in the vicinity of the business.  Approximately ten minutes later, V. Asaro exited the business, and later that afternoon, he was seen again outside of the towing business on Liberty Avenue, speaking with defendant Ragano.  When V. Asaro attempted to depart in his car, agents observed him drive into a metal pillar.

iv.     Search/Expert Evidence

During the June 2013 search at the location identified by CW-1, FBI agents recovered from a hole in the cement basement floor multiple human bones including an entire right hand and wrist, hair, teeth, possible soft tissue fragments and clothing.[13] Subsequent examination by the Office of Chief Medical Examiner (the "OCME") Forensic Anthropology Unit determined that the human remains identified above were consistent with originating from the same individual, specifically, a male aged approximately 20 to 35 years. In addition, the human remains were positively identified via DNA testing by the OCME as those of Paul Katz, and a death certificate was issued for Katz, identifying the cause of death as homicidal violence.

b.     The Lufthansa Heist

Vincent Asaro also is charged with participating in, conspiring to commit and directing several armed robberies, including the notorious robbery of approximately $5 million in cash and jewelry worth approximately $1 million from Lufthansa Airlines in December of 1978 (the "Lufthansa Heist").[14]

---

[13]     A photograph of the search site is attached as Exhibit B.

[14]     In addition to the Lufthansa Heist, V. Asaro is charged with conspiring to rob and aiding and abetting the robbery of gold salts worth approximately $1.25 million from a Federal Express ("FedEx") employee in February of 1984.  CW-1 was assigned to V. Asaro at the time, and V. Asaro directed CW-1 to involve J. Asaro in the heist.  Thereafter, J. Asaro and CW-1 scoped out the location of the anticipated robbery and followed the relevant FedEx truck at least once prior to the robbery.  CW-1 was given a total of approximately $240,000 to $250,000 for his role in the robbery, receiving the money in approximately two installments.  CW-1 gave half of this amount to V. Asaro, and $10,000 to V. Asaro to be given to V. Asaro's superior in the Bonanno family at the time.

i.      Cooperating Witness Information

V. Asaro's participation in the Lufthansa Heist has been corroborated by information provided by more than four cooperating witnesses, including witnesses associated with three different crime families.

CW-1 participated in the Lufthansa Heist at V. Asaro's direction.  James "Jimmy the Gent" Burke, a Lucchese associate who shared a close criminal relationship with Asaro, told CW-1 that he had a "score" that could net millions of dollars.  CW-1 participated in several planning meetings with Burke, V. Asaro and others, including other members and associates of the Lucchese family, and others.

On the night of the robbery, the robbery team, brandishing guns, detained the Lufthansa terminal workers and robbed the vault of, among other things: (1) approximately 50 boxes, each containing $125,000, (2) a silver box containing jewelry, such as gold chains, rings, watches, and settings, and (3) German money.  Each person involved in the robbery was supposed to receive approximately $750,000 in United States currency, but according to CW-1, most did not live to receive their share (either because they were killed first or it was never given to them).  Proceeds from the robbery were provided to members of the Lucchese and Bonanno families.  Shortly after the robbery, CW-1 brought V. Asaro's superior in the Bonanno family, CW-2, an attaché case filled with gold and jewelry.  Because CW-2 was V. Asaro's superior in the Bonanno family at the time, V. Asaro told CW-2 about his and CW-1's participation in the heist.

CW-2 and CW-3 have advised that V. Asaro, his cousin (a reference to CW-1) and Jimmy Burke were involved in the Lufthansa Heist, the fact that valuable jewelry was stolen during the heist, and that V. Asaro gave some of that jewelry to CW-2.  Another

cooperating witness ("CW-4")[15] also has advised that Burke's associate told him that he participated in the robbery, along with CW-1, and that V. Asaro later took all of CW-1's share of the proceeds from the heist.

ii. <u>Consensual Recording</u>

In addition, in a consensual recording of a conversation between V. Asaro and CW-1 on February 17, 2011, V. Asaro stated the following, in substance and in part, which CW-1 interpreted as being about the proceeds of the Lufthansa Heist:

> We never got our right money, what we were supposed to get, we got fucked all around.  Got fucked all around, that fucking Jimmy [Burke] kept everything.

---

[15] CW-4 was an associate of the Gambino family, who pled guilty pursuant to a cooperation agreement in the Eastern District of New York to two counts of murder in-aid-of racketeering, narcotics distribution conspiracy and money laundering conspiracy.  CW-4's information has been corroborated by, among other things, physical surveillances, consensual recordings and the testimony of other witnesses.  CW-4 cooperated in the hopes of obtaining leniency in sentencing and protection in the Witness Security program.  At sentencing, the government moved, pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), to permit a downward departure and/or below-guidelines sentence based upon the substantial assistance provided by CW-4 to the government; CW-4 was subsequently sentenced to time served plus one year and one day, which equated to approximately 85 months in prison.

### iii.    Other Evidence

The testimony of the various cooperating witnesses is corroborated by, inter alia, shipping documents and information obtained from Lufthansa Airlines and Commerz Bank documenting the $5 million in U.S. currency and approximately $1 million in jewelry stolen in the December 11, 1978 robbery of Lufthansa Airlines employees at JFK.

### c.    Murder Solicitation

### i.    Cooperating Witness Information

V. Asaro and J. Asaro are also charged with soliciting the murder of their relative, referred to herein as John Doe #1, in or about and between January 1, 1983 and December 31, 1985.  CW-1 has advised that CW-1 and the Asaros are cousins (in varying degrees) of John Doe #1, and are also related to another individual with ties to organized crime (the "boat owner").  In the 1980s, the boat owner wanted to fraudulently collect insurance money related to a boat he owned.  The boat owner accordingly hid his boat at John Doe #1's mother's house on Long Island and reported it stolen, collecting the insurance money.  When John Doe #1's mother learned of the situation, she reported it to the police and later the boat owner was arrested on federal charges including insurance and mail fraud. John Doe #1 later went to court and testified regarding what had happened with the boat.

According to CW-1, V. Asaro approached CW-1 about murdering John Doe #1 because V. Asaro viewed him as an informant, which violated the rules of organized crime.  At the time that V. Asaro proposed the idea of killing John Doe #1, V. Asaro was an inducted member in the Bonanno family.  A short time later, V. Asaro and J. Asaro again raised the murder of John Doe #1.  J. Asaro stated that he was upset that John Doe #1 had become a "rat."  CW-1 was present on many occasions where V. Asaro and J. Asaro

26

discussed murdering John Doe #1.  CW-1 became alarmed and warned his cousin by passing a message through another relative.  CW-1 later learned that John Doe #1 moved to Florida.

ii. <u>Other Evidence</u>

The information provided by CW-1 has been corroborated by documentary evidence and public records, including (1) a police report from the boat owner reporting the boat stolen, and (2) testimony of John Doe #1 at the trial of the boat owner and his co-conspirator.

d. <u>Arson and Arson Conspiracy</u>

i. <u>Cooperating Witness Information</u>

V. Asaro and J. Asaro are charged with conspiring to commit and committing the arson of a building in Ozone Park, New York in approximately January 1980 to January 1981.  CW-1 has advised that, at that location in approximately 1981, he and J. Asaro burned down the night club "Afters," a known meeting place of many organized crime members and associates that was named for "after Lufthansa."  V. Asaro advised CW-1 that Dominic Cataldo, who owned an Italian restaurant across the street from Afters, was upset that the new owners of Afters were going to replace it with a social club that catered to African Americans.  V. Asaro directed CW-1 and J. Asaro to burn down the club so that the new business could not open.  CW-1 and J. Asaro purchased gasoline and poured it throughout the inside of the social club.  They then took a rubber ball, lit it on fire and threw it through a window to ignite the gasoline.  Shortly after the arson, CW-1 saw V. Asaro and Cataldo, both of whom gave CW-1 a kiss on each of his cheeks to acknowledge CW-1's part in the arson.

27

ii.     Other Evidence

Other evidence corroborating the information provided by CW-1 includes (1)

surveillance evidence that the social club was burned down at that time, (2) lay witness

testimony that the social club was burned down and that at that time, there was an Italian

restaurant located across the street.

e.     Extortionate Collection of Credit Conspiracy/Extortionate
       Collection of Credit in 2013

i.     Cooperating Witness Information

CW-1 has advised that on multiple occasions, V. Asaro told him he had

borrowed money at extortionate rates of interest from a Bonanno family associate (the

"associate") who has a lucrative autobody business as well as a successful loansharking

business.  V. Asaro stated to CW-1, in substance and in part, that the associate will never be

formally inducted into the Bonanno family because V. Asaro and others make too much

money off of him, which CW-1 understood to mean V. Asaro and others associated with the

Bonanno family borrow money from the associate and do not pay him back.

ii.     Consensual Recordings

In consensual recordings beginning on March 8, 2013, V. Asaro mentioned to

CW-1 that the Bonanno family associate had been loaning thousands of dollars to

individuals, including $75,000 to an individual who was associated with a Gambino crime

family member who worked at a car wash (the "car wash employee").  After mentioning

various individuals to whom the associate had loaned money, V. Asaro stated that he "and

Jackie [Bonventre]" were "collecting" on those loans.  CW-1 understood from his

conversations with V. Asaro that the associate did not have permission from his superiors in

28

the family to make this and other loans, and that the loan associated with the car wash employee was not being paid back.  In addition, based on his conversations with V. Asaro and others, CW-1 understood that V. Asaro intended to and ultimately did collect money through extortionate means from the associate related to the car wash employee loan.

In a consensually recorded meeting with Ragano, CW-1 and others on April 26, 2013, which is excerpted below, V. Asaro discussed assaulting the associate and sending other individuals, including Ragano, to intimidate the associate into paying V. Asaro and other members of the Bonanno family in connection with the car wash employee loan:

| V. Asaro: | So uh…what's going on, uh….how do you feel?  What's going on?  Any news? |
| Ragano: | When do we stab this guy [the associate] in the neck?  That's what I want to know. |
| V. Asaro: | Stab him today. |
| Ragano: | When?  That's the problem I want to know. |
| V. Asaro: | Today!  Today! |
| CW-1: | Take it easy, what are you stabbing, cockroaches? |
| Ragano: | He's the worst, this guy.  This guy is the worst. |
| V. Asaro: | What happened now? |
| Ragano: | He's the worst.  He don't know when to shut his mouth. |
| V. Asaro: | I told you to give him a fucking beating.  Give him a fucking beating, I told you that.  Listen, I sent three guys there to give him a beating, already, so it won't be the first time he got a beating from me. |
| . . . . | |
| V. Asaro: | John, do you know what you gotta do now?  Go back to him and tell him listen to me . . . , don't tell him who . . . . Never, never tell this guy who . . . . I am gonna tell you why.  He shits in his |

29

| | pants when you don't tell him who . . . . 'Cause he don't know who, or what's this or what's that.  Cause if you tell him who, it's Vinny, it's Gary . . . . Never tell them who….Say they opened up…(UI)[16] you think I am going, fucking (UI) |
|---|---|
| Ragano: | What are you telling me uh . . . . And uh…can you defend uh…and (UI) they got uh . . . . You don't think I don't tell him that all the time? |
| V. Asaro: | How come I get results understand—I . . . get results right away. |
| Ragano: | I don't get results?  I don't want to uh…I wouldn't uh…Whatever you want me to do, Vin. |
| V. Asaro: | What happened with Frankie [the car wash employee's business partner] now? |
| Ragano: | You sent me over there to get 10% and I bring you 4…..it's one of the uh….it's only uh…. |
| . . . . | |
| V. Asaro: | When you go, when you go see Frankie from the car wash—you understand?  You can't go alone.  You gotta go with another goodfella [made member of the Bonanno family].  This way he can't deny it.  'Cause he'll say, "I never said that to John that he's gonna take care of it."  He never said that—and he's gonna tell, "I never said that to [the associate]." |
| Ragano: | He said that [the associate] came to see him.  That's what he told him.  He told [the associate] that he went to see the guy, or he sent somebody to see the guy, and the guy said, as soon as I'm done with this, one way or the other, I'm gonna take care of my obligation . . . . |

Later, on May 16, 2013, V. Asaro explained to CW-1 more details of the loan the associate had made to the car wash employee and that, when the car wash employee stopped making payments on the loan, the associate notified V. Asaro or Jerome Asaro about the loan because he needed someone to intercede and "sit down" on his behalf, i.e., meet

---

[16]     For purposes of this memorandum, unintelligible and inaudible portions of recordings are denoted by "(UI)" and "(IA)," respectively.

with members of the Gambino crime family, with which the car wash employee was associated, to resolve the dispute of the money owed on the loan.  V. Asaro informed CW-1, in substance and in part, that V. Asaro had participated in such a sit-down, and that V. Asaro had collected $40,000 on the loan in the past week.  V. Asaro also stated, in substance and in part, that he had received $10,000 of that amount, while J. Asaro had received $10,000, Ragano had received $6,000, and Tommy D (Di Fiore) was supposed to get $4,000.  V. Asaro stated that he had taken Di Fiore's share, however.  He also stated, in substance and in part, that $80,000 was still owed in connection with the loan and that V. Asaro was going to take $50,000 of that amount for himself.  He later stated, however, that he planned to take all of the money for himself.

In a consensually recorded meeting on June 11, 2013, V. Asaro informed CW-1 of the amount of money he, J. Asaro, Bonventre and Di Fiore were receiving on the loan, and denounced Di Fiore for collecting money on the loan, saying he wanted to kill Di Fiore. This portion of the conversation was as follows:

| | |
|---|---|
| CW-1: | What happened with the money from uh – the what do ya call it, the, the car wash? |
| . . . . | |
| CW-1: | They was supposed to give you… |
| V. Asaro: | Oh stop it.  Supposed to give me what?  We cut it up! |
| CW-1: | You got four thousand . . . . |
| V. Asaro: | Four thousand?  I got 14 thousand.  I blew it, gambling.  What don't – what are you making a face?  Why, who are you, you better than me? |
| . . . . | |
| CW-1: | Did you give, what's his name, Tommy [Di Fiore] the money? |

31

| | |
|---|---|
| V. Asaro: | Who? |
| CW-1: | Tommy, the $4,000. |
| V. Asaro: | (IA) |
| CW-1: | See, that's what bothers me. |
| V. Asaro: | I had a big fight with him the other day.  We had $30,000 coming, he took $15,000 of it.  I want to kill this motherfucker.  We had $30,000 coming…me, Jackie [Bonventre] and Jerry [Asaro].  Alright?  He says, well without us we wouldn't have collected it.  So we went for the money, gave me five, they gave him 15.  He says, "You owe me two."  Forget about the four, I owed him another two.  Alright?  "I'm taking that two."  I said Tom, I ain't got nothing, man.  I said, you're taking 15?  "Yeah, without me," he says, "you wouldn't a got nothing." |
| CW-1: | He's that type of guy? |
| V. Asaro: | Oh he's a cocksucker.  Makes Joey Massino [former Bonanno family boss] look like St. Anthony, motherfucker. |

Accordingly, as the consensual recordings demonstrate, V. Asaro collected thousands of dollars through extortionate means from the associate by participating in a sit down with members of the Gambino family regarding the car wash employee loan, and by engaging in violence and threats of violence using individuals associated with the Bonanno family members – including Ragano – to intimidate the associate and others into paying V. Asaro and his co-defendants money that had been collected on the loan.

3.    Argument

The nature and circumstances of the charged crimes clearly favor detention for V. Asaro.  Taken together, his powerful status in the charged racketeering enterprise and demonstrated history of both participating in acts of violence and directing others to do so

32

present clear and convincing evidence of the danger he would present to the community if granted bail.

      B.      <u>Defendant Jerome Asaro</u>

            1.     <u>Defendant Jerome Asaro Is a Captain in the Bonanno Family</u>

                 a.     <u>Cooperating Witness Information</u>

Defendant Jerome Asaro is an inducted member of the Bonanno family, who currently holds the position of captain.  According to CW-1 and CW-2, J. Asaro was inducted into the Bonanno family in approximately the early 1990s.  Later in the 1990s, around the time when V. Asaro was sent to prison to serve a state sentence, V. Asaro promoted J. Asaro to acting captain, <u>i.e.</u>, the member of the family who would act as captain for V. Asaro while he was imprisoned.  According to CW-2, J. Asaro was elevated to the position of captain by CW-2 at or around the time when CW-2 demoted V. Asaro to the position of soldier in the 1990s.  According to CW-3, as of 2003, J. Asaro was a captain in the Bonanno family with a crew that included his father, V. Asaro.

                 b.     <u>Consensual Recordings</u>

J. Asaro's position in the family has been corroborated by recently recorded statements of V. Asaro and Bonventre.  For example, during a September 23, 2010 recording of Bonventre, Bonventre stated to CW-1, in substance and in part, that he had seen J. Asaro, who was in a halfway house until December 2010, that J. Asaro was not going out of his way to see anybody (a reference to individuals associated with organized crime), and that Bonventre had told J. Asaro that if J. Asaro has anything to take care of, he should take care of it now, before he had restrictions on whom he could see and before he was on parole.

During a July 19, 2012 consensual recording, V. Asaro stated in substance and in part, that he at that time was reporting to J. Asaro. In addition, in an August 17, 2012 consensual recording, V. Asaro made the following statements about how he had elevated J. Asaro to the position of acting captain years earlier:

> V. Asaro:     Fuck Jerry. Fuck him in his ass. Fucking Jerry is for Jerry. Jerry's for Jerry. I lost my son. I lost my son when I made him a skipper. I lost my son when I put him there. Jerry's for Jerry. Fucking greedy cocksucker. Greedy cocksucker. Got him a job. $600 a fucking week, he was sending your son to do everything. He didn't do a fucking thing. . . . (UI) the last fucking person in the world (UI). I lost my son when I made him as acting skipper.

Additionally, in a March 8, 2013 consensual recording, V. Asaro stated, in substance and in part, that J. Asaro had sponsored three members of the Bonanno family for induction, which captains are authorized to do in La Cosa Nostra.

2.    Jerome Asaro Is Charged with Crimes of Violence Including Murder Solicitation, Accessory After the Fact to Murder, Arson and Arson Conspiracy, Attempted Armed Robbery and Armed Robbery Conspiracy

As detailed above, several other crimes of violence with which J. Asaro stands charged demonstrate his dangerousness to the community. First, J. Asaro is charged with repeatedly and aggressively soliciting V. Asaro's and others' participation in the murder of John Doe #1 because of John Doe #1's believed status as an informant. J. Asaro is also charged with being an accessory after the fact to the Paul Katz murder. Specifically, at the direction of his father V. Asaro, he sought to obstruct justice and hinder the prosecution of his father and others associated with organized crime by digging up and moving the remains

of Paul Katz's body nearly two decades after his murder.[17]   This extremely serious crime on its own warrants a permanent order of detention against J. Asaro.

In addition, J. Asaro is charged with direct involvement in the arson of the Afters Lounge in the 1980s, as well as conspiracies to commit armed robberies including the armed FedEx robbery described above, from which he ultimately was excluded against his will.  J. Asaro also is charged with attempting to commit an armed robbery of an armored car in or about and between 1984 and 1986, which he and his co-conspirators believed to be carrying approximately $1 million in U.S. currency.  CW-1 has advised that after receiving direction from V. Asaro, CW-1, a Gambino family associate, J. Asaro and another individual attempted to carry out the robbery of the armored car, armed with guns and wearing masks.  Their attempt was foiled and J. Asaro and CW-1 were forced to report their failure to V. Asaro, who was angry because the robbery was not executed properly.

### 3.   Jerome Asaro Is Charged with a Recent Crime of Violence

As detailed above, Jerome Asaro is charged with the extortionate collection of credit, and the conspiracy to engage in extortionate collection of credit, from a Bonanno family associate.  J. Asaro was on federal supervised release at the time of these charged crimes.  The violent nature of these offenses, the fact that J. Asaro was on federal supervised release when they were committed, and J. Asaro's role in collecting money from the

---

[17]   In addition, as the government noted in its opposition to the modification of J. Asaro's bail conditions in his prior federal prosecution captioned United States v. Virtuoso et al., No. 06-CR-800 (CBA) (E.D.N.Y.), Docket No. 202, at 5-6, CW-3 testified at a trial in the Eastern District of New York in 2006 that he called upon J. Asaro to dispose of the car in which a Bonanno family captain named Gerlando Sciascia was murdered, and J. Asaro complied and disposed of the car.  See United States v. Basciano, No. 03-CR-929 (NGG), Trial Transcript, at 2818-2821, attached as Exhibit C.  J. Asaro's pattern of obstructive conduct for the benefit of the Bonanno family is a strong indicator of his dangerousness to the community.

associate, support a finding that J. Asaro is dangerous and should be subject to a permanent

order of detention.  First, V. Asaro's recorded statements indicate that J. Asaro had obtained

approximately $15,000 in connection with the car wash employee loan as of June of 2013.

Moreover, the recorded statements of Ragano on the April 26, 2013 consensual recording

demonstrate J. Asaro's role in intimidating the associate into paying him, V. Asaro and

others in connection with the loan.  During that meeting, Ragano related the following to V.

Asaro and CW-1 about his interaction with the associate regarding the loan:

> I told him [the associate], "I don't want to fucking hear nothing Jer—
> Rob— you got to take care of this.  There is no fucking talking about it.
> That's it.  You just got to take—" "Can I get one day, to uh, let me just
> ask Jerry if that's what he wants me to do . . . ." "Listen I'll give u that,
> Bo" . . . . I already knew the answer, I gave him another day, that's all.
> The next day he came up with it . . . .

At the time of this recording, J. Asaro remained on federal supervised release.[18]  That he

would participate in a crime of violence – extortionate collection of credit – while under the

Court's supervision is indicative of his lack of respect for the Court's rules and the law and is

perhaps the best proof of the danger he would present to the community if released on bail.

    4.    <u>Argument</u>

        Both the nature of the charged crime (racketeering) and the circumstances of

the defendant's involvement in that crime, which includes solicitation to commit murder and

accessory after the fact to murder as well as his more recent participation in a crime of

violence, weigh in favor of detaining J. Asaro pending trial in this case.  He has proven to be

capable of both directing crimes of violence and carrying out the orders of others, including

his co-defendant and father V. Asaro, and he should not be given a further opportunity to do

---

[18]    J. Asaro's term of supervised release began on November 2, 2010 and
terminated on November 1, 2013.

so and thus endanger the general public, including possible government witnesses and cooperating witnesses.

C.   Defendant Jack Bonventre

    1.   Jack Bonventre Is an Acting Captain in the Bonanno Family

        a.   Cooperating Witness Information

CW-1 has advised that Jack Bonventre is an inducted member of the Bonanno family who reports to Jerome Asaro, and that prior to his induction, he was an associate in the Bonanno family.  According to CW-1, Bonventre rose in the ranks to become an acting captain for J. Asaro.

In addition to information provided by other cooperating witnesses, CW-2 has also advised that Bonventre is an inducted member of the Bonanno family who, as of 2003, reported to J. Asaro.

        b.   Consensual Recordings

Over the past three years, consensual recordings of both V. Asaro and Bonventre corroborate Bonventre's position in the Bonanno family and that he recently has been considered for promotion within the family.  For example, in a consensual recording from March 8, 2013, V. Asaro stated in substance and in part that Bonventre had been offered the administration position of "consigliere," but that Bonventre turned the offer down because he "didn't want to leave Jerry [Asaro]," meaning that Bonventre wanted to continue to report to J. Asaro.  V. Asaro stated in that recording that he spoke to Di Fiore (to whom he refers as "Tom" or "Tommy") about the situation.  Additionally, during a September 23, 2010 consensual recording, Bonventre stated that he had recently seen J. Asaro, who was

then in a federal halfway house, which corroborates Bonventre and J. Asaro's close criminal association.

c.   <u>Surveillance Evidence</u>

Furthermore, as noted above, in September of 2013, Bonventre was observed attending the wake of a former Bonanno family captain at a funeral home in Brooklyn, in addition to several other inducted members of the Bonanno family.

2.   <u>Jack Bonventre Is Charged with Racketeering and a Recent Crime of Violence</u>

As detailed above, Bonventre is charged with the extortionate collection of credit, and the conspiracy to engage in extortionate collection of credit, from a Bonanno family associate. The violent nature of these charged crimes, and Bonventre's role in collecting money from the associate, demonstrate that he is dangerous and should be detained pending trial in this case. V. Asaro's recorded statements indicate that Bonventre obtained approximately $5,000 in connection with the car wash employee loan as of June of 2013. In addition, the recorded statements of V. Asaro and Ragano on the April 26, 2013 consensual recording, excerpted below, demonstrate Bonventre's role in collecting the amount due on the car wash employee loan:

| V. Asaro: | Yeah, and the guy [the associate] is a rat. The guy is a rat! |
|---|---|
| Ragano: | I said, "Bo, let me tell you something Bo." He went to Jack [Bonventre], he went to Vin, he went to this guy, I says, "I'm telling you right now Rob, if I gotta fucking come back and forth here a hundred times because of his fucking shit, I'm going to beat your fucking ass. I had enough of your shit, you stand here and lie to me? You are a fucking liar." |

. . . .

38

| | |
|---|---|
| V. Asaro: | Did Jack tell you to go over there and talk to that Frankie [the business partner of the car wash employee]? |
| Ragano: | I went to see Frankie. |
| V. Asaro: | And?  What happened? |
| Ragano: | Frankie said that Rob, that's why I said, can't keep, can't stop with— Rob seen Frankie. |
| . . . . | |
| V. Asaro: | Let me tell you something, John. They want you to go, understand?  Call up, understand?  Go to Beano [associated with the Gambino family]. . . . Say they can't call him.  You gotta call him, understand? |
| Ragano: | They told him, Jack told him what to do. You don't even got to call him.  All they have to do is call the accountant and his accountant will call the guy up and they'll take care of it…. Jack already explained it to him. |

Bonventre's charged participation in the foregoing extortionate collection of credit is a compelling basis for detaining him pending trial in this case.

Bonventre is also charged with managing a lucrative overseas illegal gambling operation involving sports betting in approximately September of 2007 through March of 2008.  Evidence of this operation consists of, among other things, information provided by a cooperating witness, lay witness testimony, surveillance evidence and consensual recordings. CW-1 has advised that Bonventre managed the illegal gambling operation, and that such operations are the so-called "bread and butter" of organized crime families.

Consensual recordings of Bonventre and others confirm his participation in such illegal activity.  For example, during a December 21, 2009 recording, Bonventre expressed his distaste for those bettors who seek out law enforcement.  Bonventre's pertinent statements are as follows:

| | |
|---|---|
| Bonventre: | . . . . [Y]ou can't put pressure on these people because they run to the law. |
| CW-1: | Yeah. |
| Bonventre: | They run to the law. And then, you know what, it's a lot cheaper to fucking, take a fucking hit for a few thousand then it is to pay a fucking lawyer. Because that's what's gonna happen. The minute you squeeze 'em a little bit they run to the law. |
| CW-1: | Yeah. |
| Bonventre: | They run to the fucking law immediately. Immediately. Immediately . . . . |
| . . . . | |
| Bonventre: | What the fuck is there? Everybody runs to the law. Everybody's a fucking rat. Everybody, they're fucking horrible. |

3.    Argument

Given Bonventre's leadership position within the Bonanno family, his status as a lucrative manager of the family's illegal gambling operation and the nature of the charged crimes of violence against him, the government respectfully submits that there is clear and convincing evidence that he should be detained pending trial.

D.    Defendant Thomas Di Fiore, also known as "Tommy D"

1.    Defendant Thomas Di Fiore Is a Captain and a Member of the Administration in the Bonanno Family

a.    Cooperating Witness Information

Defendant Thomas Di Fiore, also known as "Tommy D," is an inducted member of the Bonanno family who currently holds the position of captain and, according to

CW-1, became a member of the family's administration in approximately 2012.[19]  CW-2 has

advised that he sponsored Di Fiore for membership in the Bonanno family and performed Di

Fiore's induction ceremony in approximately 1985 or 1986.  Di Fiore reported to CW-2 after

first having reported to "Philly Lucky," a made member of the Bonanno family who was

murdered in 1981 after he and two other crime family captains attempted to take over the

family from boss Phil Rastelli.  CW-2 also advised that in the 1970s and 1980s, Di Fiore was

responsible for picking up thousands of dollars per month in protection money that various

trucking companies based at JFK were paying the Bonanno family.

b.    Consensual Recordings

Di Fiore's current position in the Bonanno family has been confirmed by

consensual recordings in which V. Asaro made statements about Di Fiore's status in the

crime family.  For example, during a June 23, 2012 consensual recording, V. Asaro stated to

CW-1 about Di Fiore, "[n]ow we have a fuckin' scumbag, the new boss.  Cheap scumbag

(UI) . . . . Some scumbag from Long Island."  In an August 17, 2012 consensual recording,

V. Asaro reiterated that Di Fiore was the Bonanno family's new boss and that he had

discussed with Di Fiore the prospect of promoting people in the family, including Bonventre.

V. Asaro stated, in sum and substance:

> We got a new boss.  Some guy from the Island, Tommy.  (UI) don't say
> nothing to nobody.  (UI) Tommy, listen to me, I'm broke.  (UI)
> Tommy, I couldn't make, uh Jackie . . . .Tommy to make Jackie (UI).  I
> was gonna tell him, but I wanted to ask Jackie (UI) want it.  Uh, but I,
> he asked me.

Later in the same recording, V. Asaro acknowledged to CW-1 that he "knows" the new boss

from Long Island.  In an August 25, 2012 consensual recording, V. Asaro confirmed to CW-

---

[19]    This information is also corroborated by other source information.

41

that V. Asaro is on "the panel" or the "commission" of the Bonanno family and that he was recently re-made a "skipper" by Di Fiore. In addition, during a March 8, 2013 consensual recording, V. Asaro told CW-1 about an upcoming meeting at which captains in the Bonanno family, including "Tommy," will be present, and said that V. Asaro had been talking to Di Fiore about the plan to vote at the meeting to "take some guys down," with which V. Asaro disagreed.

<b>c.      Surveillance Evidence</b>

As noted above, Di Fiore also was observed attending a captain's meeting with V. Asaro and other known Bonanno family members on December 29, 2012 at a diner in Staten Island. Di Fiore likewise was observed attending the September 2013 wake of Bonanno family captain Joseph Cammarano, Sr., described above, along with V. Asaro, Bonventre, Ragano and numerous other inducted members of the Bonanno family.

<b>2.      Thomas Di Fiore Is Charged with a Recent Crime of Violence</b>

As recited above, Di Fiore is charged with the extortionate collection of credit, and the conspiracy to engage in extortionate collection of credit, from a Bonanno family associate. Di Fiore's leadership role in collecting money from the associate in connection with this loan demonstrates Di Fiore's dangerousness to the community, particularly because of his ability to induce his subordinates in the Bonanno family to commit violence at his behest. As V. Asaro noted in the June 11, 2013 consensual recording described above, Di Fiore was supposed to get $4,000 from the first extortionate collection from the associate, but V. Asaro kept that money for himself. By June of 2013, when an additional $30,000 had been collected on the loan, Di Fiore took half of the proceeds, according to V. Asaro, and demanded another $2,000 from V. Asaro. As V. Asaro told CW-1:

42

| V. Asaro: | I had a big fight with him the other day.  We had $30,000 coming, he took $15,000 of it.  I want to kill this motherfucker.  We had $30,000 coming…me, Jackie and Jerry.  All right?  <u>He says, well without us we wouldn't have collected it.</u>  So we went for the money, gave me five, they gave him 15.  He says, "You owe me two." Forget about the four, I owed him another two.  Alright? "I'm taking that two."  I said Tom, I ain't got nothing, man.  I said, you're taking 15?  <u>"Yeah, without me," he says, "you wouldn't a got nothing."</u> |
|---|---|
| CW-1: | He's that type of guy? |
| V. Asaro: | Oh he's a cocksucker.  Makes [the former Bonanno family boss] look like St. Anthony, motherfucker. |

(Emphases added).  Based on Di Fiore's statements, related to CW-1 by V. Asaro, Di Fiore was instrumental in making sure that dispute was resolved in the Bonanno family's favor, and said as much in justifying to V. Asaro his demand for more than half of the proceeds.

      3.    <u>Argument</u>

Di Fiore is the highest ranking member of the Bonanno family currently at liberty.  In the words of his own direct reports – Asaro – it was Di Fiore who enabled the Bonanno family to collect an upaid debt through the use of extortionate means.  Based upon his status in the crime family as well as this charged conduct, Di Fiore has the power to direct others in the Bonanno family to use violent means to do his bidding.  Accordingly, the government respectfully submits that it has demonstrated through clear and convincing evidence that Di Fiore is a danger to the community and should be detained.

E.    <u>Defendant John Ragano, also known as "Bazoo"</u>

    1.    <u>Defendant John Ragano Is a Soldier in the Bonanno Family</u>

        a.    <u>Cooperating Witness Information</u>

Defendant John Ragano, also known as "Bazoo," is an inducted member of the Bonanno family.  According to CW-1, Ragano was inducted into the family in approximately early 2013 and currently holds the position of soldier.

        b.    <u>Consensual Recordings</u>

The information provided by CW-1 is corroborated by consensual recordings of Ragano, V. Asaro and others.  For example, during a December 9, 2010 recording, V. Asaro informed CW-1, in substance and in part, that the Bonanno family is going to "straighten [] out . . . Bazoo," meaning formally induct him into the crime family.  Then, during a March 8, 2013 consensual recording, V. Asaro told CW-1, in sum and substance, that Ragano had been inducted into the Bonanno family.  Shortly thereafter, during an April 26, 2013 consensual recording, when Ragano entered the diner and greeted V. Asaro and CW-1, CW-1 gave Ragano a kiss on the cheek, and told him "congratulations," implicitly congratulating him on his induction into the family.

        c.    <u>Surveillance Evidence</u>

Ragano was observed in attendance at the May 2011 wedding of J. Asaro's daughter, along with other associates of organized crime.  In addition, Ragano attended the September 2013 wake of Joseph Cammarano, Sr., with numerous other members of the crime family, as set forth <u>supra</u>.

2.      Ragano Is Charged With Recent Crimes of Violence

Like his co-defendants, Ragano is charged with the extortionate collection of credit, and the conspiracy to engage in extortionate collection of credit, from a Bonanno family associate.  Not only did Ragano, in his own consensually recorded statements on April 26, 2013, admit to playing an active and pivotal role in extorting money from the associate, but also, he explicitly acknowledged his willingness to assault and intimidate others in order to fulfill the aims of the Bonanno family.  Not only did Ragano begin the conversation with V. Asaro by asking him, "[w]hen do we stab this guy [the associate] in the neck?", but also, he stated that he threatened to "beat [the associate's] fucking ass" when he approached him about the outstanding debt owed on the loan.  Ragano, V. Asaro and CW-1 then engaged in the following colloquy about the associate, for whom Ragano worked at the associate's towing company:

| | |
|---|---|
| Ragano: | I said, "[g]o in the back room [associate]."  I said, "First of all you cocksucker," I said, "Vinny was trying to help you, that's number one and you fucking lied to him."  I said, "[w]hat is the problem?  Why would you want me to be the bad guy here?  I'm going to wind up being the bad guy here [associate] and I'm not going to fucking stop when I start." |
| . . . . | |
| Ragano: | I collect, Bo… I do, I do all right, do I do all right? |
| V. Asaro: | You do good. |
| . . . . | |
| Ragano: | I try not to abuse him in the office like Vin does . . . .You know what I mean . . . .I bring 'em in the back room at least . . . . |
| V. Asaro: | Oh I abuse him in the fucking office in front of everybody.  I abuse him in front of everybody. |

CW-1:        Well you're you, and he's him.  (Laughing)

Ragano:      Well I got to work there . . . . (UI)

V. Asaro:    No, no I don't want you—

CW-1:        I know.  He's not telling you to—

JR           I know I am just saying . . . .It's not even a job, Vin, I got to be honest with ya . . . . It's like found money from him.

. . . .

Ragano:      He told me that he was gonna take care of this.  I told him yesterday, I told him Thursday—he says I'll take care of it by Monday.  Wait till Monday, Monday morning he comes in at 7 o'clock in the morning.  If he didn't fucking get the accountant, Vin, I promise you I will grab him by his fucking neck Monday morning.  I promise you.  I told him that you need to take care of this.

. . . .

V. Asaro:    How come I get results, understand?  I . . . get results right away.

Ragano:      I didn't get results?  I don't get—I wouldn't uh…whatever you want me to do, Vin.

In addition, as V. Asaro noted in the June 11, 2013 consensual recording described above, Ragano received $6,000 from the first extortionate collection from the associate, reflecting his central role in the extortion.

>       3.       <u>Ragano Has Engaged in Uncharged Crimes of Violence</u>

As noted above, V. Asaro described to CW-1 in a consensual recording from June 11, 2013, that he and Ragano jointly participated in the recent assault of a neighborhood "muscle guy."  V. Asaro states in that recording that he "crack[ed]" the guy, after which "John comes running in, punches him in the head."

46

4.      <u>Argument</u>

Ragano's unsolicited aid of V. Asaro, assaulting a stranger in his (V. Asaro's)

defense, and his enthusiasm for "grab[bing]" and "stab[bing]" others at the direction of

Asaro and to benefit the crime family to which has sworn allegiance firmly establishes, by

any standard, the need for pretrial detention in this case.  Accordingly, Ragano should be

detained.

II.      <u>History and Characteristics of the Defendants</u>

A.      <u>Defendant Vincent Asaro</u>

1.      <u>Vincent Asaro Has a Violent and Extensive Criminal History</u>

In addition to the crimes charged in this case, which span a 45-year period, V.

Asaro has a series of past felony convictions, including 1998 convictions in New York state

court for enterprise corruption, criminal possession of stolen property in the third degree and

offering a false instrument to file in 1998, for which he received incarceratory sentences of

four to twelve years and 28 months to seven years, respectively; a 1972 federal conviction in

the Eastern District of New York for burglary of a post office, for which he received a

sentence of six months' imprisonment (to be served on consecutive weekends for a year) and

five years' probation; a 1970 federal conviction in the Eastern District of New York for theft

from an interstate shipment, for which he received a sentence of five years' probation; an

assault in the third degree conviction in New York state court in 1967; a 1960 petit larceny

conviction in New York County Criminal Court; and a 1960 conviction in New York County

Criminal Court for unlawful entry.  V. Asaro was also convicted after a jury trial in New

York state court of the misdemeanor of aggravated unlicensed operation of a motor vehicle

in the second degree, for which he received a sentence of 6 months' imprisonment.  In

addition, V. Asaro has been arrested a total of approximately 21 times, beginning in 1957 when he was 21 years old, for crimes including rape, burglary, bank robbery, kidnapping, felonious assault, and possession of a loaded firearm. Many of the charges for which he was arrested in these cases were later dismissed.

The Court should consider, in evaluating the propriety of pretrial detention, V. Asaro's extensive, violent criminal history which includes a conviction for the New York state equivalent of racketeering. See, e.g., United States v. Fama, No. 13 Cr. 234(JFK), 2013 WL 2467985, at *3-*4 (S.D.N.Y. June 7, 2013) (entering permanent order of detention for Gambino family associate where, inter alia, defendant "has violated bail in the past" and has an "extensive criminal history" which included "serv[ing] a significant sentence as a result of his involvement in organized crime"); see also United States v. Wilson, 493 F. Supp. 2d 397, 400 (E.D.N.Y. 2006) (noting, in context of anonymous jury motion, that "the Defendant's criminal history and his participation in a large scale criminal enterprise without question show that he is dangerous").

2.      Participation in Other Uncharged Recent Acts of Violence

In addition to the charged crimes, Vincent Asaro has indicated in his own words on consensual recordings from the past approximately three years that he has personally assaulted and threatened to injure multiple individuals. These recent acts of violence, like those charged in the indictment, typify V. Asaro's aggressiveness and ruthlessness and demonstrate that he will continue to engage in violence and to direct others to commit violent acts if he is released pending trial in this case.

For example, during an October 28, 2010 consensually recorded phone call, V. Asaro told CW-1 about a dispute he had with a group of men tied to another organized crime family in the neighborhood.  The pertinent portion of the call was as follows:

| | |
|---|---|
| V. Asaro: | I got some beef with one of them guys over there with them other guys, you know, around here, you know. |
| CW-1: | Yeah. |
| V. Asaro: | What a fucking beef I had in front of everybody. |
| CW-1: | Are you okay? |
| V. Asaro: | Yeah. |
| CW-1: | Oh. |
| V. Asaro: | In front of everybody.  It was like five of them there.  I said, "I'm fucking sick, I'm fucking disgusted . . . ."  I almost ripped the fence down.  They looked at me (laughing) like I was fucking crazy. |
| CW-1: | Yeah. |
| V. Asaro: | I said, "what the fuck yous guys think that yous are the only fucking crew in this fucking neighborhood?  I'm sick and tired of your fucking bullshit.  I said let's fucking go the stats," I told them.  I says, "Vinny Asaro's name?  Zero.  Your name?  This incident, that incident, this incident, like –what is this there a one way fucking street here with you fucking guys?"  Try to make a fucking issue, an issue about somethin', you know?  I— |
| CW-1: | Yeah. |
| V. Asaro: | I jumped all over them.  There was like four of them there, by Dom's club. |

During an August 27, 2012 recording, V. Asaro related to CW-1 that he recently had assaulted an associate of the Bonanno family, and also, separately, had punched a man in the face at the race track and had kicked another man:

V. Asaro:          I had a beef with [the associate].  Seen that fucking [associate] last week.  Come to blows.  I stuck my finger in his fucking eye, in his eyes.  I said ["Associate,"] (UI) fucking bottle.  He didn't say anything, he just fucking walked away.  "Oh you know, you ain't even the man in charge."  Who the fuck told you that, you motherfucker you?

CW-1:              (UI) the block.

V. Asaro:          Yeah.  Started with me.  I walked over to see Mike, give him a head's up on something.  And uh, he [the associate] follows me down the block.  "What are you doing here?"  Who the fuck are you talking to?  Who the fuck are you?  "I ain't afraid of you."  He went inside but he wasn't afraid of me (sarcastic).  But he went inside and called Mike first.  (UI).

. . . .

V. Asaro:          He's a jerkoff.  I had a big beef with him two weeks ago.  I hit him in the head with a bottle.  He's lost his fucking mind. . . .

. . . .

V. Asaro:          I was there [at Belmont] yesterday.  I punched a guy in the face.

Unidentified Male:   Did you really?

V. Asaro:          Yeah.  It's a whole big thing.  Nothing happened.

. . . .

V. Asaro:          Last week I was there, I kicked that fucking, you know that Ronnie? He used to take the action.  Gypsy.

UM:               Oh, Gypsy.  I know, yeah, yeah.

V. Asaro:          He was stoned on fucking either Vicodin, or Percoset, or Oxycontin.

CW-1:              Oh yeah, yeah.  Ronnie, Ronnie.

50

| | |
|---|---|
| V. Asaro: | I kicked him twice.  He says, "I'll have you arrested."  You fucking rat. |
| UM: | What a nice guy. |
| V. Asaro: | Fucking scumbags. . . . |

In a consensual recording on June 11, 2013, V. Asaro related to CW-1 a recent incident in which he and Ragano had assaulted a man from the neighborhood.  The relevant portion of their conversation was as follows:

| | |
|---|---|
| V. Asaro: | Look at this guy.  I'll fight this guy.  Me and John [Ragano] had a fight the other day, we pummeled some guy. |
| CW-1: | Who, Bazoo? |
| V. Asaro: | Me and Bazoo, me and Bazoo, some guy in [a Bonanno family associate]'s office. |
| CW-1: | (Laughs.)  A customer? |
| V. Asaro: | No, uh, some guy from the neighborhood, a muscle man.  He says, "is [the associate] here?"  He told me, I say, "no, he's not here, it's Saturday."  I says, "why you look so grumpy?  Why you . . . "  "You know, you need a lobotomy," he goes.  "What you talking about?"  "Yeah," he says, "you're crazy."  Boom!  Then I crack him, John comes running in, punches him in the head.  "All right, all right!"  You know the guy.  The muscle guy. |

CW-1 also has advised that in approximately 2005 or 2006, V. Asaro aided and abetted the assault of teenagers or young men who were hanging out near a bodega across the street from a social club in Ozone Park, New York that V. Asaro and other Bonanno family members and associates frequented.  The young men apparently had thrown a bottle in the direction of the club one day.  V. Asaro came out of the club and started arguing with the young men, stating, in substance and in part, that he was going to "bust their

hole." When they responded that they would not fight an old man, V. Asaro ripped off his

shirt, took off his glasses, put up his hands and stated, in substance and in part, "let's go."

The young men avoided a fight. Soon, additional young men arrived in the vicinity, and V.

Asaro summoned other Bonanno family members and associates. After V. Asaro pointed out

the young men to his associates, they began punching and chasing a few of the young men.

A few days later, V. Asaro sent CW-1 back to the club to check on it, and CW-1 reported

back to V. Asaro that the young men mentioned they were part of a gang but never retaliated.

Shortly thereafter, V. Asaro told CW-1, in substance and in part, to stay away from the club

because he did not want them to get arrested.

### 3. Argument

Both his criminal history and recidivist status and these recent assaults

demonstrate an ongoing pattern of violence and intimidation by V. Asaro that has continued

over several decades. For the foregoing reasons, V. Asaro is a danger to the community and

should be detained pending trial.

### B. Jerome Asaro

#### 1. Jerome Asaro's Violation of Supervised Release and Criminal History Further Demonstrate His Dangerousness and Disregard for the Law

Jerome Asaro's substantial criminal history and his continued association with

members of organized crime while he was on federal supervised release in this district,

which resulted in his being found guilty of violating the conditions of his supervised release,

further favor entering a permanent order of detention against him.

Most recently, in September of 2008, J. Asaro was convicted upon a guilty

plea in the Eastern District of New York of racketeering, including predicate acts of illegal

gambling (bookmaking) and extortionate collection of credit, and was sentenced to 30 months' imprisonment to be followed by three years' supervised release, along with a $2,500 fine. In May of 2011, he violated the special condition of his supervised release that he not associate with individuals associated with organized crime when law enforcement agents observed organized crime associates at his daughter's wedding of whose attendance he had not notified Probation in advance, including the Gambino associate with whom he committed the attempted robbery described above. J. Asaro acknowledged this conduct in a consensually recorded conversation with CW-1 on August 15, 2011, during which J. Asaro stated that the Gambino associate was his "childhood friend," whom he had known for 45 years and who was his "daughter's godfather." As a result of the Gambino associate and others' attendance at J. Asaro's daughter's wedding, J. Asaro was found guilty of violating a condition of his supervised release, his supervised release was modified and he was sanctioned with 90 days in a residential re-entry center.

J. Asaro also has had other convictions, including a 1977 conviction of attempted petit larceny in New York state court; and, in the 1980s, several Class A misdemeanor convictions in New York state and local courts, including attempted arson in the fourth degree, for which he was sentenced to 60 days of intermittent confinement, three years' probation and a $1,000 fine, harassment, and criminal possession of stolen property in the fifth degree. J. Asaro was also arrested on other occasions on charges of, inter alia, burglary in the third degree and drug possession, which charges were dismissed.

2.    Participation in Other Uncharged Recent Acts of Violence

Jerome Asaro continues to serve as an active captain in the Bonanno family and has recently acted threateningly toward a Bonanno family associate assigned to him (the

"associate").  In a consensual recording from December 7, 2011, the associate described to

CW-1 how J. Asaro had become enraged with him when he loaned money out to various

individuals while J. Asaro was away in prison.  After CW-1 asked the associate if he had any

money, the associate responded as follows:

> I'm broke.  I have nothing, I have nothing, I don't have it, I swear to
> God, I don't. . . . I'm in so much trouble with Jerry, I can't give a dollar
> out, I'm not allowed to give a dollar out without asking him.  I, that's
> what I'm told, I'm sorry.  You go through Jerry (UI)  Jerry's fucking
> fuming (UI), I lent money out while he was away, and I didn't ask
> permission, and he fucking ripped my (UI) out . . . . I can't give a
> fucking dollar . . . . Not only do I have, I have a problem with him.
> Yeah I don't want to get in no beef with Jerry. . . . 'Cause he got
> violated.  One of the reasons he got violated was because of me.  They
> showed a picture of us (UI) the violation.  You didn't know that?
> Yeah, they showed a picture of us. . . . (UI)  Anyway, that's one of the
> reasons he got violated.  It's not my fault, but, you know, but still, I
> was one of the . . . he's fucking fuming at me but I don't want to get in
> no beef with him.

Moreover, CW-1 advises that in the early 1990s, a woman (the "female") cut

J. Asaro's sister, and V. Asaro's daughter, in the face with a glass bottle.  When V. Asaro

found out about the incident, he directed J. Asaro repeatedly to retaliate.  J. Asaro, was then

only an associate of the Bonanno family, indicated to V. Asaro that he would take care of the

situation.  Later, J. Asaro advised CW-1 that he had shot the female in the buttocks in a bar

in Queens, New York.

       3.   <u>Argument</u>

Taken as a whole, J. Asaro's criminal history, which includes a racketeering

conviction, a supervised release violation for interacting with organized crime associates

while on supervised release, and an attempted arson conviction, among others, serves as

another basis for detaining him pending trial.  He has demonstrated a commitment to a life of

organized crime, including acts of violence, as well as a continued disobedience of the.  His participation in these uncharged acts of violence provide additional evidence of the need to protect society from this defendant by detaining him prior to trial.  Finally, the indictment charges Asaro with crimes committed while he was on supervised release, including extortion and managing the affairs of the Bonanno crime family.  The government respectfully submits that this evidence alone establishes by clear and convincing evidence that J. Asaro is a danger to the community and should be detained.

      C.    <u>Defendant Jack Bonventre</u>

      1.    <u>Criminal History</u>

Bonventre was convicted of a federal charge of illegal gambling in 2007, for which he was sentenced to nine months' imprisonment, to be followed by three years' supervised release, and a $30,000 fine.  Prior to that, in April of 2005, Bonventre was convicted in New York state court of falsifying business records in the second degree, a Class A misdemeanor, for which he was sentenced to conditional discharge, five days' community service and a $250 fine.  Bonventre also was convicted in 1991 in Nassau County Court of the infraction of driving while impaired by alcohol, resulting in the revocation of his driver's license and a $250 fine.

      2.    <u>Pretrial and Supervised Release Violations</u>

In addition, Bonventre's conduct while on federal pretrial release and federal supervised release is powerful proof of his disregard for the law and his betrayal of this Court's trust.  After Bonventre's arrest and indictment in the Eastern District of New York in February of 2007 on an illegal gambling charge, while he was on pretrial release, Bonventre engaged in the very conduct with which he is charged in the instant indictment: bankrolling a

lucrative gambling operation.  Indeed, Bonventre is charged with committing this offense from September 1, 2007 through March 1, 2008 – a six-month period beginning prior to his September 20, 2007 guilty plea in his previous federal case and ending months before his sentencing in that case.  In addition, while Bonventre was on supervised release after serving his nine-month custodial sentence in that case, he met with V. Asaro and CW-1 on more than one occasion despite the condition of his supervised release that he not associate with members or associates of organized crime families.  Bonventre's meetings with V. Asaro and CW-1 were captured on consensual recordings from, e.g., November 28, 2011.[20]

3.     Argument

Bonventre has repeatedly violated court orders by maintaining his association with and leadership position in the Bonanno crime family.  Based upon this factor alone, he should be detained pending trial.

D.     Defendant Thomas Di Fiore

1.     Criminal History

Di Fiore's substantial criminal history includes a prior conviction for a crime of violence.  Beginning in 1966, Di Fiore was arrested on at least five occasions for crimes ranging from kidnapping in the second degree, to serious assault charges, to promoting gambling in the first degree, to buying and receiving stolen property.  In 1970, Di Fiore was convicted in New York state court of reckless endangerment in the second degree and received a sentence of conditional discharge.  Years later, in 2001, Di Fiore was convicted of

---

[20]     Bonventre's criminal history also includes a 2005 conviction in Queens County Criminal Court of the Class A misdemeanor of falsifying business records in the second degree, and a 1991 infraction of driving while impaired by the consumption of alcohol.

federal extortion and was sentenced to 29 months' imprisonment followed by three years' supervised release.

### 2.      Di Fiore Has Engaged in an Uncharged Murder Solicitation

According to CW-2, in approximately 1999 to 2000, Di Fiore solicited CW-2 to aid and abet a murder. Specifically, CW-2 learned that Di Fiore's son had received a beating from bouncers at a topless bar. Another member of the Bonanno family, on Di Fiore's behalf, asked CW-2, Di Fiore's superior in the Bonanno family, for permission for Di Fiore to kill the Lucchese family-affiliated bouncers in retaliation for the beating. CW-2 refused to grant Di Fiore permission to commit this murder. CW-2 also advised that Di Fiore had proposed his son for membership in the Bonanno family, but CW-2 had denied the proposal.

### 3.      Argument

Based upon his status as a leader in organized crime, the charged conduct, and his criminal history, Di Fiore should be detained pending trial.

### E.      Defendant John Ragano

### 1.      Ragano's Violent Criminal History Reflects His Dangerousness

In 1999, Ragano was convicted in New York state court of kidnapping in the second degree and was sentenced to ten years' imprisonment. The alleged facts underlying this offense are particularly disturbing: Ragano displayed a handgun and held up an accounting firm in Ozone Park, ordering the firm's owners to turn over all of the firm's cash. When one of the owners informed him that the firm no longer dealt in cash, Ragano told him that he wanted the security code for the owner's house. He then told the owner what the address of the owner's house was, and stated that he and his accomplices had someone

57

watching the owner's house. Ragano and an accomplice then used flex cuffs to tie up the owners in the back room of the firm.  Soon thereafter, the police arrived and a hostage situation ensued.  Ragano and his accomplice ultimately surrendered and Ragano hid the firearm he had used in the robbery in a filing cabinet, which was recovered the next day. Ragano's state parole for this offense ended in early 2009, and soon thereafter, Ragano reimmersed himself in the affairs of the Bonanno family.

Ragano also was convicted in 2002, while serving a lengthy sentence in state custody, in the Eastern District of New York of federal conspiracy and theft of government fund charges, for which he received a sentence of 30 months' imprisonment, to be followed by three years' supervised release, as well as $68,923 in restitution.  Apparently in light of his long state sentence, Ragano did not begin his period of federal supervised release until 2010, and the term did not expire until February 2013.  Accordingly, Ragano appears to have been inducted into the Bonanno family either during or very soon after his period of supervised release.

In addition, Ragano disturbingly was arrested at the age of 18 on charges including attempted murder in the first degree of a police/correctional officer.  Ragano ultimately pled guilty in Nassau County Court to an alternative, serious charge of robbery in the first degree, and was sentenced to eight to 24 years' imprisonment.  Not long after he began serving his sentence, Ragano was charged with knowingly making or possessing dangerous contraband while incarcerated in the first degree.  Ragano's first arrest was two years prior, when he was 16 years old, for petit larceny and possession of stolen property charges, which ultimately were dismissed and adjourned in contemplation of dismissal, respectively.

Ragano's grave and extensive criminal history, in addition to the other factors outlined above, strongly suggests the propriety of ordering him detained pending trial.

2.      Ragano Has Engaged in Uncharged Crimes of Violence

As noted above, V. Asaro described to CW-1 in a consensual recording from June 11, 2013, that he and Ragano jointly participated in the recent assault of a neighborhood "muscle guy."  V. Asaro states in that recording that he "crack[ed]" the guy, after which "John comes running in, punches him in the head."  Ragano's lack of qualms about assaulting a stranger in defense of V. Asaro, or otherwise to benefit the Bonanno family, further establishes the appropriateness of his pretrial detention in this case.

3.      Argument

For the foregoing reasons, Ragano should be found to be a danger to the community and detained pending trial.

III.      Seriousness of the Danger Posed by the Defendants' Release

Each of the defendants poses a clear danger if released.  Not only would there be a very serious danger to potential witnesses and victims, but the community at large would be endangered.

The seriousness of the danger posed by the defendants' release cannot be underestimated in light of their personal involvement in crimes of violence and their ability to order others to commit such crimes on their behalf, and on behalf of their co-defendants. This factor favors detention especially in the cases of V. Asaro, J. Asaro, Bonventre and Di Fiore, who, in light of their leadership of crews within the Bonanno family and – with respect to V. Asaro and Di Fiore – their positions in the family's administration, but the same can be said of Ragano, who has demonstrated a willingness to engage in violence at his co-

59

defendants' behest and is capable of ordering the associates below him to engage in criminal activities.

The district court's analysis in <u>Salerno</u>, 631 F. Supp. at 1375, is instructive.  In <u>Salerno</u>, the court ordered two leaders of the Genovese organized family detained and noted:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions.  The illegal businesses, in place for many years, require constant attention and protection, or they will fail.  Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual.  When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

Id. at 1375.  The <u>Salerno</u> court's reasoning applies equally here, and accordingly, all five defendants should be detained.

IV.    <u>Evidence of the Defendants' Guilt</u>

As demonstrated above, the government's evidence of the defendants' guilt of the charged crimes is strong.  The government intends to prove the defendants' guilt at trial through the testimony of numerous witnesses, including cooperating witnesses from multiple organized crime families, and eyewitnesses.  In addition, V. Asaro, Bonventre and Ragano were intercepted on numerous consensual recordings discussing the charged crimes, and, in the case of J. Asaro, his affiliation with organized crime.  Physical and documentary evidence, such as phone, property, business and domiciliary records underscore the defendants' guilt.

By way of example, with respect to some of the most serious crimes charged in this case – namely, the Paul Katz murder and the Lufthansa Heist – the government's evidence is overwhelming.  The evidence relating to the Paul Katz murder and the movement

60

of Katz's body several years later includes not only the testimony of CW-1, but also testimony of forensic anthropologists and criminologists regarding the bones, teeth and hair found at the address identified by CW-1 and their forensic match to Katz's DNA and his physical profile at the time of his death, the consensual recording of V. Asaro when he learns of where the FBI is digging on June 17, 2013, and the surveillance evidence of V. Asaro driving past the site of the dig moments later, and shortly thereafter, driving to his son, J. Asaro's, business.

With respect to the Lufthansa Heist, four cooperating witnesses from multiple organized crime families have advised of both V. Asaro's and CW-1's involvement in the heist and the large amounts of cash and valuable jewelry obtained as a result of the robbery. The evidence of the Lufthansa Heist extends beyond such testimony to include contemporaneous business records of Lufthansa documenting the nature and value of the items stolen, photographs of the crime scene taken shortly after the robbery, and the consensual recording of V. Asaro speaking with CW-1 about how Jimmy Burke kept the majority of V. Asaro's and CW-1's shares of the proceeds of the heist.

Accordingly, the government's evidence against the defendants is strong and clearly favors detention.

V.    The Defendants' Risk of Flight

In addition to the facts set forth above, each of the defendants constitutes a flight risk due to the lengthy prison term each faces. On the current charges, V. Asaro faces a sentence of up to life imprisonment, and the other four defendants face up to twenty years' imprisonment. In terms of the advisory U.S. Sentencing Guidelines ("Guidelines") range each defendant faces, J. Asaro's estimated range is 292 to 365 months' imprisonment, but

with the 20-year statutory maximum, is limited to 240 months.  Bonventre's estimated Guidelines range is 97 to 121 months' imprisonment, Di Fiore's estimated Guidelines range is 57 to 71 months' imprisonment, and Ragano's estimated Guidelines range is 41 to 51 months' imprisonment.[21]

The defendants' significant sentencing exposure, as described above, gives them a substantial incentive to flee, and their access to large amounts of cash gives them the means to do so.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

---

[21]     These Guidelines range calculations are only estimates and are subject to change.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that "no condition or combination of conditions will reasonably assure [the defendants'] appearance . . . as required and the safety of the community," and that all five defendants therefore should be detained pending trial.  18 U.S.C. § 3142(e)(3)(B).

Dated:  Brooklyn, New York
        January 23, 2014

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

                    By:   /s/_____
                          Nicole M. Argentieri
                          Alicyn L. Cooley
                          Assistant United States Attorneys
                          (718) 254-6232/6389